UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LES TELECOMMUNICATIONS D'HAITI S.A.M., <br><br> Plaintiff, <br><br> – against – <br><br> FRANCK CINE, <br><br> Defendant. | **MEMORANDUM, ORDER & JUDGMENT** <br><br> 13-CV-6462 |



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ DEC 19 2014 ★
BROOKLYN OFFICE

**Parties**

Plaintiff
Les Télécommunications
D'Haiti S.A.M

**Appearances**

Bertrand Rolf Madsen
Madsen Law P.C.
111 Broadway, Trinity Building
13th Floor, Suite 1305
New York, NY 10006
(212) 346-4665
bmadsen@madsenlawpc.com

Joshua B. Spector
Perlman, Bajandas, Yevoli & Albright, P.L.
1000 Brickell Avenue, Suite 600
Miami, FL 33131
(305) 377-0086
jspector@pbyalaw.com

Paul D. Turner
Perlman, Bajandas, Yevoli & Albright, P.L.
200 South Andrews Avenue, Suite 600
Fort Lauderdale, FL 33301
(954) 566-7117
pturner@pbyalaw.com

Silvia Lucia Serpe
Silvia L. Serpe, LLC
1115 Broadway, 11th Fl.
New York, NY 10010
(212) 257-5010
sserpe@serperyan.com



1

Defendant  
Franck Ciné

Guy A. Lewis  
Matthew Simmons  
Michael R. Tein  
Michelle Durieux  
Lewis Tein, PL  
3059 Grand Avenue, Suite 340  
Coconut Grove, FL 33133  
(305) 442-1101  
lewis@lewistein.com  
msimmons@lewistein.com  
tein@lewistein.com  
mdurieux@lewistein.com

**JACK B. WEINSTEIN, Senior United States District Judge:**

**Table of Contents**

I. Introduction ............................................................................................................................2  
II. Findings of Fact ......................................................................................................................4  
   A. Launching of Haitel: Haiti's First Mobile Telephone Company ...................................4  
   B. June 3, 1998: Teleco Resolution....................................................................................4  
   C. June 14, 1998: Haitel Collects Subscriptions for Its Shares in Anticipation of Share Capital Increase ................................................................................................................5  
   D. June 25, 1998: Teleco and Haitel Sign Licensing Agreement ......................................6  
   E. November 24, 1998: Haitel Shareholders Agreement...................................................7  
   F. March 2007: Parties Disagree About the Manner in which Articles 2 and 5 of the Licensing Agreement Operate and Validity of November 24, 1998 Agreement ..........12  
   G. July 2007: Teleco Files Lawsuit Against Haitel in which Haitel Participates ..............13  
   H. September 2013: Haitel Demands Arbitration ............................................................13  
III. Standard for Determination of Foreign Law .......................................................................13  
IV. Findings of Haitian Law.......................................................................................................14  
   A. Delegating Managing Powers of Boards of Directors Via Mandate ...........................15  
   B. Confirmation of Contract.............................................................................................16  
   C. Apparent Mandate .......................................................................................................16  
   D. Defense of Nullity in Breach of Contract Action .......................................................16  
V. Application of Law to Facts .................................................................................................17  
VI. Statute of Limitations ...........................................................................................................19  
VII. Waiver ..................................................................................................................................19  
VIII. Conclusion ...........................................................................................................................19

### I. Introduction

Central to this controversy is the right to payment for control of a valuable radio wave band required in operating Haiti's mobile telephone system. Plaintiff contends that the dispute

should be decided by a Haitian court in a case that has been proceeding for some years. Defendant seeks to have arbitrators decide.

On October 27 and 29, 2014, a bench trial to decide ruling Haitian law was held. (Bench Trial Hr'g Tr. Oct. 27 & 29, 2014 ("Tr.").) *See* Fed. R. Civ. P. 44.1; *Les Télécommunications d'Haiti S.A.M. v. Ciné*, No. 13-CV-6462, 2014 WL 2655451, at *7 (E.D.N.Y. June 13, 2014). Two issues under Haitian law were to be decided:

> *First*, whether an agreement entered into by the parties in June 1998, which contained a dispute resolution clause subjecting disputes to the jurisdiction of Haitian courts, governs the litigation rights of the parties; and
>
> *Second*, whether a November 1998 agreement superseded the June 1998 agreement between plaintiff Les Télécommunications d'Haiti S.A.M. ("Teleco") and Haiti Télécommunications Internationales S.A. ("Haitel"), which defendant Ciné controls; and if the arbitration provision the latter agreement contains is enforceable against Teleco.

Based on the written and oral evidence in the record, including Haitian law expert opinions supplied by both parties, the November 1998 agreement has no binding effect on plaintiff; plaintiff was never a party to it. The arbitration provision contained in that agreement does not bind Haitel.

Plaintiff's motion for an order permanently staying defendant's demand for arbitration is granted.

The parties have not objected to admission of any evidence. Assuming some form of civil law proof applies, and that this evidence would be given its natural probative force, the findings set out below would be reached. Assuming the Federal Rules of Evidence apply, the same result would be reached. *Cf. Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) (finding federal rules of practice apply to cases tried in federal court).

The court's specific findings of fact and conclusions of law are stated pursuant to Rule 52 of the Federal Rules of Civil Procedure. *See infra* Parts II-VI. It is assumed that Rule 52 applies

3

in a bench trial finding foreign law. *But cf.* Fed. R. Civ. P. 52(a)(3) (providing findings of fact and law not required when ruling on a motion for summary judgment under Rule 56).

## II. Findings of Fact

### A. Launching of Haitel: Haiti's First Mobile Telephone Company

Franck Ciné, a resident of New York, is the founder of Haitel, the first mobile telephone company in Haiti. *Les Télécommunications d'Haiti*, 2014 WL 2655451, at *1. He and his immediate family are the majority shareholders of Haitel; he is the chairman of the board of directors and the president of Haitel. (Decl. Ciné ¶ 3, ECF No. 53-1.)

When Haitel was launched in 1998 it needed a radio frequency band with which to operate. *Les Télécommunications d'Haiti*, 2014 WL 2655451, at *1. Teleco, a telecommunications company in Haiti, owned a 1.9 GHz frequency band, which it agreed to license to Haitel for fifteen years. (June 25, 1998 Contract art. 2, ECF No. 25 ("Licensing Agreement").)

### B. June 3, 1998: Teleco Resolution

The final version of this licensing agreement was presented to Teleco's board of directors on June 3, 1998. (Tr. 187:10–188:4.) On the same day, Teleco's board of directors issued a written resolution approving the contract and specifically authorizing the president of the board, Fritz Jean, to sign "The HAITEL S.A. contract" on behalf of Teleco. (June 3, 1998 Teleco Resolution, ECF No. 26 ("Resolution").) This resolution was attached to the licensing agreement. (Tr. 187:19–188:4.) At trial, the parties stipulated that "on June 3rd, 1998[,] there was a [complete] physical contract, negotiated, and that [, although the contract was actually only signed on June 25, 1998,] . . . the contract [attached to the resolution] was . . . authorized by the board on June 3rd, 1998." (*Id.* 187:20–24.)

4

### C. June 14, 1998: Haitel Collects Subscriptions for Its Shares in Anticipation of Share Capital Increase

On June 14, 1998, the board of directors of Haitel collected the following subscriptions for its shares:

| | |
|---|---|
| Frank N. Ciné | 287,476 shares |
| SOCABANK | 5,000 shares |
| SOGED S.A. | 4,500 shares |
| M.C.I. | 3,000 shares |
| Marie Ginette Jacques | 12 shares |
| Erns F. EXCEUS | 6 shares |
| Jehan D. COLIMON | 3 shares |
| Leslie PEAN | 3 shares |

(Haiti's Gazette, *Le Moniteur* ("*Le Moniteur*"), P00342, ECF No. 88-6.) Fifteen days later, reflective of the subscriptions collected, Haitel formally decided to increase its share capital to 300,000 shares. (*Id.*) As stated in the August 30, 1999 issue of *Le Moniteur*, on June 29, 1998, Haitel decided:

> [T]o increase the Share Capital of the Company up to... HTG 75,000,000.00 ... by creating ... 300,000.00 ... new shares of ... HTG 250[] each, cancelling the old shares for which the owners will receive the corresponding percentage in the newly created shares.

(*Id.*; Tr. 40:17–24.) According to the online website "Trading Economics," the value of USD $1 averaged 31.60 Gourdes ("HTG") from 1994 until 2014, "reaching an all time high of 50 in February 2003 and a record low of 14.85 in August of 1996." (Trading Economics, tradingeconomics.com, http://www.tradingeconomics.com/haiti/currency (last visited December 17, 2014).) Between May 29, 1998 and August 31, 1999, the value of USD $1 fluctuated between approximately 16 and 17 HTG. (*Id.*; *see also* Oanda, oanda.com, http://www.oanda.com/currency/historical-rates (last visited December 17, 2014) (finding the value of USD $1 averaged 16.6040 HTG between May 29, 1998 and August 31, 1999);

Tr. 40:25–41:2 (plaintiff's attorney noting, without objection by defendant, that USD $1 is worthy approximately "15 gourdes").)

At the June 29, 1998 Haitel shareholders meeting, Haitel raised its listed capital by creating 300,000 shares at 250 HTG per share, but with variable value in American dollars.

### D. June 25, 1998: Teleco and Haitel Sign Licensing Agreement

On June 25, 1998, Teleco and Haitel signed a licensing agreement. (Licensing Agreement 7.) The preamble to the agreement provides that Teleco was "represented by . . . Mr. Julio CADET . . . authorized for the purposes hereunder by the President of the Board of Directors, Mr. Fritz JEAN." (*Id.* 1) It will be recalled that Jean had been authorized by the board of Teleco to sign the agreement. *See supra* Part II.B. Haitel was "represented by Mr. Robert Bernard Denis." (*Id.*) The agreement was signed by five individuals: (1) Julio Cadet; (2) Fritz Jean; (3) Robert Bernard Denis; (4) Jean Ary Ceant, Haiti's telecommunications regulator; and (5) Jacques Dorcean, the chairman of the board of directors of the Haiti Minister of Public Works, Transportation and Communications. (*Id.* 7.)

Articles 2, 5 and 16 of the agreement provide for a fifteen year lease of the frequency band and payment for the lease. The contract reads, in relevant part:

> **Art. 2.** By virtue of the present contract, TELECO authorizes [Haitel] to operate, for a period of fifteen (15) full and consecutive years, the 1.9 GHZ frequency band for a fee of 14.5 million US dollars. . . .
>
> **Art. 5.** In return for the operating rights, [Haitel] shall pay 5% of its net turnover every fiscal year to TELECO.
>
> **Art. 16.** *Any claims or disagreement between TELECO and [Haitel]* concerning the interpretation or the execution of one or more clauses of the present contract shall be the object of prior negotiations between the parties, in the eyes of the Haitian Legislation governing the matter. In case of persistent failure in negotiations, the parties *shall* ask to *be referred to a Haitian Tribunal competent in the matter*.

(*Id.* (emphasis added).)

Almost three months later, on September 16, 1998, Cadet—purportedly to be acting on behalf of Teleco, but without authorization by the board of directors or its president, Jean—wrote a letter to Haitel indicating that, in accordance with the June 25, 1998 agreement, shares in Haitel should be used to guarantee the USD $14.5 million to Teleco. (Sept. 16, 1998 Letter from Cadet to Haitel, ECF No. 82-2; Tr. 30:25–35:20, 129:14–130:19.) It reads in part:

> [T]o avoid any possibility of default on payments, TELECO proposes that, at first, a payment of ONE MILLIONE GOURDES be made as soon as possible and that HAITEL, S.A. deposit with TELECO a block of shares equivalent to the amount of the balance to be paid with gradual deductions within a deadline of no more than fifteen (15) years, at the end of which the shares deposited shall be returned to HAITEL, S.A.

(*Id.*) *See supra* Part II.C. (discussing USD/HTG conversion rate).

Critical is the fact that Cadet was never specifically authorized by Teleco's board to write this letter or to sign the November 24, 1998 agreement on behalf of Teleco. (Tr. 129:14–130:19 (THE COURT: "[H]e could write a letter saying I'd like to negotiate but he couldn't . . . enter into an agreement without going to the board."); *see also id.* 176:21–177:3 (defendant's expert agreeing that "based on th[e] lack of a writing, [he] concluded that the president [of Teleco's board of directors, Mr. Jean] could delegate his authority to Mr. Cadet [to write the letter without asking the board for permission]").)

### E. November 24, 1998: Haitel Shareholders Agreement

A little more than two months after Cadet sent the USD $14.5 million fee payment terms letter to Haitel, on November 24, 1998, a Haitel shareholders agreement was signed by Ciné, Cadet, two banks—SOCABANK (a/k/a Société Caraibeenne de Bank S.A.), SOGED S.A. (a/k/a Société Générale de Distribution S.A.)—and MCI (a former American telecommunications company now acquired by Verizon Communications). (Nov. 24, 1998 Amended and Restated Shareholders Agreement CINE000145, ECF No. 82-3 ("Shareholders Agreement").) It

7

purported to protect Teleco's right to payment of the USD $14.5 million by Haitel through what amounted to escrow rights in Haitel's stock shares. (*Id.* art. 3.) Teleco's board did not approve this agreement or authorize Cadet to sign on Teleco's behalf. (Tr. 176:21–177:3.)

Article 10.02 of the shareholders agreement is the arbitration clause relied on by defendant Ciné. (Def.'s Mot. to Compel Arbitration ¶ 9, ECF No. 18.) Article 11.05 is the superseding clause. The relevant articles of the shareholders agreement read:

> **Art. 3.01.** <u>Capitalization of the Company</u>. The parties acknowledge and agree that upon the execution of this Agreement . . . the authorized capital stock of the [Haitel] Company will consist of three hundred thousand (300,000) shares of common stock, par value two hundred fifty Gourdes per share. . . .
>
> **Art. 3.03.** <u>Deposit of TELECO Shares with Trustee</u>. TELECO hereby agrees to endorse in blank all certificates of stock representing the Shares which it owns as of the date hereof or which such Shareholder acquires in the future, and shall deposit said certificates with the Trustee to be held subject to the terms of the Share Escrow Agreement. [Haitel] acknowledges that each of the Shareholders shall have the right to vote and receive dividends on its Shares.
>
> **Art. 3.04.** <u>Redemption Right for TELECO Shares</u>. [Haitel] shall have the right to redeem the Shares issued to TELECO . . . at any time for an aggregate redemption price of fourteen million five hundred thousand dollars (US$14,500,000) (the "<u>TELECO Redemption Price</u>"). The TELECO Redemption Price shall be reduced by the amount of any and all dividends paid with respect to the TELECO Shares. [Haitel] may exercise its redemption right to all or any portion of the TELECO Shares at any time or from time to time by notifying TELECO and the Trustee of its intent to do so, and by delivering to TELECO the TELECO Redemption Price, or the applicable portion thereof, in the case of a partial redemption. . . .
>
> **Art. 10.01.** <u>Disputes</u>. Within ten (10) days of the written request of any Shareholder, the Shareholders shall meet to negotiate in good faith a resolution of any dispute, Claim or controversy arising out of or relating to this Agreement, or the breach, termination or invalidity thereof (a "<u>Dispute</u>").
>
> **Art. 10.02.** <u>Arbitration</u>. *Any Dispute [between Teleco and Haitel] . . . shall be settled by arbitration* in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law ("<u>UNCITRAL Rules</u>") . . . . All arbitration proceedings shall be conducted in English. The place of arbitration shall be Bermuda. . . . The law governing the arbitration proceedings shall be the Bermuda International Arbitration Act of 1993. . . .

8

The validity and construction of this Section shall be governed by the law of the State of New York, U.S., without regard to its conflict of laws.

**Art. 11.05.** <u>Entire Agreement: Amendments</u>. . . . *This Agreement supersedes* all prior agreements and understandings among the Parties with respect to such subject matter, including, but not limited to, *the Contract entered into between TELECO and the Company on June 25, 1998 and the related letter signed by TELECO on September 16, 1998.* . . .

(*Id.* (emphasis added).)

The shareholders agreement, which, under article 11.05, purports to supersede the licensing contract, distributes all of Haitel's share capital—the 300,000 shares approved at the June 29, 1998 meeting—to new shareholders of Haitel. (*id.* art. 3.01.) No credible evidence was offered that such a distribution took place or, if it did on the books of Haitel, that it was brought to the attention of Teleco's board. (Tr. 113:8–19). The claimed share capitalization of the company on November 24, 1998 is stated in a table that appears in Annex B of the shareholders agreement. (Shareholders Agreement CINE000169.) It is as follows:

| **Shareholder** | **Shares** | **Consideration for Shares** | **Amount Owed for Shares** |
|---|---|---|---|
| Frank N. Ciné | 230,476 | Contributions listed in Exhibit 8.02 | None |
| SOCABANK | 5,000 | US$5,000,000 | US$5,000,000 |
| SOGED S.A. | 4,500 | US$4,500,000 | US$4,500,000 |
| TELECO | 15,000 | US$14,500,000 in Frequencies | None |
| MCI | 3,000 | Management Services | None |
| MCI (Warrant Shares) | 42,000 (authorized but not issued) | Determined in MCI Stock Subscription and Warrant | To be determined |
| Board Members' Nominal Shares | 24 | None | None |

9

(*Id.*) The above chart shows a value claimed by Haitel of approximately USD $1,000 per share. This is greatly in excess of the then value in U.S. dollars. *See supra* Part II.C. (discussing USD/HTG conversion rate).

Since SOCABANK, SOGED and MCI retained the same number of shares as the subscriptions that had been collected by Haitel on June 14, 1998, new shareholders were expected to come into the corporation under the November 24, 1998 agreement. (*Compare* Share Capitalization *supra with* Part.II.C.) The November agreement called for the issuance of 15,000 shares, once held by Ciné, to Teleco, and authorized 42,000 shares, once held by Ciné, to be used as warrant shares. (Shareholders Agreement CINE000169.)

The first article of a corresponding—but unsigned—Teleco "Subscription Agreement" states:

> [Haitel] hereby offers for subscription and [Teleco] accepts the offer and hereby subscribes to fifteen thousand (15,000) newly issued Shares in consideration for the . . . rights to exploit frequency band 1.9 GHZ in Haiti until June 25, 2013 as payment for the Shares subscribed hereto. [Haitel] and [Teleco] hereby acknowledge that this subscription fully satisfies the obligations of Paragraphs 2 and 5 of the Contract entered into between [Haitel] and [Teleco] on June 25, 1998.

(*Id.* CINE000147, CINE000151.)

The practical effect of the shareholders agreement—were it to bind Teleco, which it did not—was to set aside 15,000 shares of Haitel for Teleco in lieu of payment of USD $14.5 million owed by Haitel to Teleco for use of vital Teleco radio wave rights needed to operate a mobile telephone system in Haiti.

In short, pursuant to the terms of the shareholders agreement, the unsigned Teleco subscription agreement, and an unsigned share escrow agreement (*Id.* CINE000199–203), Haitel gave 15,000 of its shares to a trustee to hold for Teleco—*i.e.*, five percent of Haitel's total shares—instead of paying in cash its obligation of USD $14.5 million and five percent of its net

10

turnover to Teleco under articles 2 and 5 of the June 25, 1998 licensing agreement. (Tr. 33:10–13, 36:19–23, 39:18–21.) Plaintiff, instead of getting the cash due to it for licensing its frequency band, was to get a promise secured by stock whose value in U.S. dollars would vary substantially over time. *See supra* Part II.C. (discussing USD/HTG conversion rate).

The shareholders agreement, excluding the appended subscription and escrow agreements, was signed by five individuals, including Ciné and Cadet. (Shareholders Agreement CINE000145.) The Teleco subscription agreement and the share escrow agreement, which relies on the Teleco subscription agreement, "pursuant to which TELECO has subscribed for 15,000 shares," were not signed by Cadet. (*Id.* CINE000151, CINE000203 .) The escrow action agreement, "whereby TELECO subscribed to 15,000 shares," was signed by both Ciné and Cadet, but not by the designated trustee Jean Henry Ceant. (*Id.* P00159–163.)

On November 24, 1998, the date of execution of the shareholders agreement, Cadet did not have written or oral authorization from Teleco's board of directors to sign the agreement on Teleco's behalf. (Tr. 74:15–18; 217:16–218:11.) There is no evidence that Teleco's board of directors was aware of any discussions or negotiations that had taken place regarding the shareholders agreement or was aware that someone would be signing the agreement claiming it was on Teleco's behalf. (*Id.* 80:21–81:3.) At the time, Cadet was not a member of Teleco's board of directors. (*Id.* 72:8–9.) No credible evidence has been produced demonstrating that: (a) Teleco ever authorized its representative to attend any Haitel shareholder meeting; (b) Haitel paid Teleco dividends on the 15,000 shares to be granted to Teleco pursuant to the November 24, 1998 agreement; (c) Teleco asked Haitel for dividends; or (d) Haitel paid for its use of Teleco's radio wave rights to Teleco. (*Id.* 78:25–80:1)

### F. March 2007: Parties Disagree About the Manner in which Articles 2 and 5 of the Licensing Agreement Operate and Validity of November 24, 1998 Agreement

By the end of 2006 or early 2007, Michel Présumé, in his role as the new General Director of Teleco, demanded that Haitel pay its USD $14.5 million debt and royalties to Teleco under the licensing agreement signed on June 25, 1998. (Présumé Dep. 9:19-24, ECF No. 82-8.) On March 12, 2007, Ciné informed Teleco in writing that Haitel was "prepared to pay to TELECO the amount corresponding to the eight (8) years of operation of the frequency calculated on the basis of fourteen million five hundred thousand U.S. dollars ($14,500,000.00 USD) for the fifteen years." (Mar. 12, 2007 Letter from Ciné to Teleco P00515, ECF No. 82-9.) Haitel argued that it owed Teleco only USD $4,896,854.56. (*Id.* P00516.) In his letter, Ciné explained that the June 25, 1998 agreement requires Haitel to pay Teleco USD $14.5 million by June 25, 2013, during which period Haitel agreed to "make annual payments of five percent (5%) of net sales, deductible from such amount." (*Id.* P00515.) Ciné claimed that Teleco had become a shareholder of Haitel on November 24, 1998. (*Id.* P00514.)

Eight days later, on March 20, 2007, Présumé informed Ciné that Teleco "is and remains committed to implementing in their entirety Articles 2 and 5 of the contract of June 25th, 1998[,] which allows Haitel to operate on the Haitian telecommunications market in exchange for payment of an entry ticket of . . . *14,500,000.00 USD*[] *and royalties* corresponding to 5% of its net turnover." (Mar. 20, 2007 Letter from Présumé to Ciné P00511, ECF No. 86-3 (emphasis added); Tr. 122:7-123:6.) He continued: "In terms of Téléco's participation in the shareholding of Haitel, this seems to be a fiction concocted in order to not honor the contractual commitments, or to delay their application as long as possible, by offering a sort of virtual guarantee. How could anyone believe that Téléco would accept in exchange for 14,500,000.00 USD, 5% of a

company whose capital amounts to 75,000,000.00 HTG?" (*Id.* P00512.) *See supra* Part II.C. (discussing USD/HTG conversion rate).

Ciné responded on April 17, 2007, stating: "I hereby ask you to please accept to a hold a meeting . . . in order to find a solution to this dispute in compliance with the provisions for wisdom stipulated in Article 10, paragraph 10.01 of the Shareholders Agreement." (Apr. 17, 2007 Letter from Ciné to Teleco P00524, ECF No. 82-9.) This letter would not be excludable under Rule 408 of the Federal Rules of Evidence as a compromise offer or statement made during negotiations. It has no probative force in deciding the critical question of fact: Did Teleco enter into the November 24, 1998 agreement?

### G. July 2007: Teleco Files Lawsuit Against Haitel in which Haitel Participates

On July 5, 2007, Teleco filed a lawsuit in Haiti for breach of the licensing agreement. *Les Télécommunications d'Haiti*, 2014 WL 2655451, at *3. Ciné participated in the litigation in Haiti. *Id.* During the still pending litigation, Ciné never raised the defense of arbitration pursuant to the arbitration provision contained in the shareholders agreement. *Id.*

### H. September 2013: Haitel Demands Arbitration

More than six years after Teleco filed its lawsuit in Haiti, on September 17, 2013, Ciné submitted a demand for arbitration relying on article 10 of the shareholders agreement. (Def. Mot. to Compel Arbitration ¶¶ 9–10; *id.* Ex. E, Sept. 17, 2013 Demand for Arbitration, ECF No. 18.)

### III. Standard for Determination of Foreign Law

Courts "may find and apply foreign law." *Aon Fin. Prods., Inc. v. Société Générale*, 476 F.3d 90, 101 (2d Cir. 2007) (citation omitted); *see also Terra Firma Investments (GP) 2 Ltd. v.*

13

*Citigroup Inc.*, 716 F.3d 296, 301 (2d Cir. 2013) (Lohier, J., concurring) ("'[D]etermining foreign law falls well within the province of federal courts, Fed. R. Civ. P. 44.1.'").

Rule 44.1 of the Federal Rules of Civil Procedure provides that the court determines foreign law as a matter of law, not fact:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

The Court of Appeals for the Second Circuit has "urge[d] district courts to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations" because "[s]uch issues can be expected to come to the federal courts with increasing frequency as the global economy expands and cross-border transactions increase." *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998) (citations omitted).

"Determination of a foreign country's law is an issue of law." *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir. 1998). "In cases [involving foreign-law experts], it is not the credibility of the experts that is at issue, it is the persuasive force of the opinions they expressed." *Id.* (citation omitted). *See also Bartsch v. Metro–Goldwyn–Mayer, Inc.*, 391 F.2d 150, 155 n. 3 (2d Cir. 1968) ("Though . . . Rule 44.1 establishes that courts may, in their discretion, examine foreign legal sources independently, it does not require them to do so in the absence of any suggestion that such a course will be fruitful or any help from the parties." (citation omitted)).

### IV. Findings of Haitian Law

The credibility and persuasive force of the opinion of plaintiff's expert, Bernard H. Gousse, is substantially greater than that of defendant's expert, Jean Sénat Fleury. Gousse has a

more extensive understanding and experience in interpreting Haitian law. (*Compare* Tr. 50:10–55:2 (Gousse vitae provided orally to the court) *with* Fleury vitae CINE001013–1014, ECF No. 83-1). The plaintiff's expert made legal, historical and logical sense. The defendant's expert did not.

### A. Delegating Managing Powers of Boards of Directors Via Mandate

Under Haitian law, the shareholders of a corporation appoint a board of directors to run and manage the corporation. (Tr. 57:4–18, 94:21–23, 124:21–24.) Teleco's bylaws read: "*The Board of Directors* shall have the most ample powers to manage and to administer the Company, *with full power* to take all decisions on all administration, management or general arrangement actions of any sort." (Teleco Bylaws P00880, ECF No. 83-2 (emphasis added).)

The board of directors may delegate its managing powers via mandate. "A mandate . . . is a transaction by which a person gives to another the authority to do something for the principal and in his name." (Civil Code of Haiti (Patrick Pierre-Louis ed., Editions Zémes S.A. 2011) (1825) ("Code"), art. 1748.) Mandates may be specific to "one or several deals only, or general and for all the affairs of the principal." (*Id.* art. 1751.) While mandates from one individual to another may be "given verbally, . . . proof thereof through a witness is allowed only for matters whose value does not exceed [a nominal amount]." (*Id.* art. 1749.)

The board can provide a mandate to the president of the board, granting him or her the ability to sign contracts, or it can authorize a non-board member employee of the corporation to sign one or more agreements on behalf of the corporation. (Tr. 72:10–18.) When granting such authorization to a non-board member, the board must do so in writing. (*Id.* 72:23–73:8.) The president of the board may also choose to delegate his or her contract signing powers. (*Id.*

15

71:11–13) He or she, however, may only delegate his or her authority to another board member. (Tr. 71:15–72:3, 74:8–14, 126:13–17.)

### B. Confirmation of Contract

Confirmation is defined as the "unilateral legal act" by which a party that can require the nullity of an act waives its right to do so expressly or tacitly by voluntarily performing under the contract. (Gousse Expert Report P00854, ECF No. 83-2.) Article 1123 of the Code, in relevant part, reads:

> In the absence of confirmation or ratification act, it is enough if the obligation [*i.e.*, contract] is performed voluntarily.

(*Id.* n.13.)

### C. Apparent Mandate

Apparent mandate consists of the legitimate belief of a third party that the person with whom he or she deals holds the powers and qualities claimed. (Tr. 75:8–17.) Apparent mandate "obligates the principal to respect the commitments taken in its name by the apparent representative." (Gousse Expert Report P00855) Three conditions are necessary for an apparent mandate to exist: (1) "apparent competence of the representative"; (2) "appearance of quality created by the principal"; and (3) "good faith of the third party." (*Id.*) While, in Haiti, the doctrine is applicable to laypersons, it is inapplicable to experienced businesspersons. (*Id.* P00855–856.)

### D. Defense of Nullity in Breach of Contract Action

The action for nullity of a contract "consists of filing an action in court to cancel a contract whose conditions for legal formation have been violated." (*Id.* P00856). By contrast, the defense of nullity occurs when it is raised in a breach of contract action. (*Id.*) The action for nullity has a statute of limitations of ten years. (*Id.*) Article 1089 of the Code reads: "In all

16

cases where the action for nullity of an agreement is not limited to a shorter term by a particular law, this action can be filed during ten years." (*Id.* n. 15) "[T]he generally admitted interpretation is that the letter of article 1089 of the Civil Code governs only the action for nullity and not the defense of nullity." (*Id.* P00857). The justification for this conclusion resides in the general law principle "*quae temporalia [sunt ad agendum, perpetua sunt ad excipiendum]*," interpreted as meaning that "as long as [a party] does not perform the contract, it is never too late for a party prosecuted for defaulting on the contract to claim its nullity." (*Id.*)

V. **Application of Law to Facts**

The "persuasive force of the opinion" of plaintiff's expert far outweighs the persuasive force of defendant's expert. *See Bartsch*, 391 F.2d at 155 n. 3. *See also supra* Part III. In contrast to defendant's expert, who conceded at trial that he did not practice corporate law in Haiti and that his "expertise is not in corporate law" (Tr. 193:13, 226:14–16), Gousse, who currently practices corporate law in Haiti, established that, under Haitian law, because the board of directors itself never granted a mandate—specific or general—to Cadet to bind the company, he had no authority to sign the November 24, 1998 shareholders agreement. (*Id.* 55:10–131:1.)

There could be no more important matter for the Teleco board to consider than the lease of a major asset—a right to use a critical band of radio waves worth millions of dollars. Any modification of the right of Teleco to secure millions of dollars in cash would need to be approved and authorized by the board. *See supra* Part IV.A. Instead of cash, it received stocks of unknown worth through an alleged shareholder agreement it had never authorized anyone to sign on its behalf. *See supra* Part II.E. On its face, the June 3, 1998 resolution, in which the board granted authority to Jean to bind Teleco, did not extend to Cadet to sign the November 24, 1998 agreement. *See supra* Part II.B.

17

Plaintiff relies on the fact that the August 30, 1999 issue of *Le Moniteur* lists all of Haitel's shareholders as of that date. (Pl.'s Proposed Findings of Fact and Law ¶ 21, ECF No. 96). This claim is not relied on by the court because the document states that the shareholder list purports to reflect subscriptions collected as of June 14, 1998. *See supra* Part II.C.

Defendant's argument that the licensing agreement, which was signed by both Jean and Cadet, indicates that there was a general authorization from Teleco's board of directors to Jean, and from Jean to Cadet, to sign agreements affecting licensing, is rejected for five reasons:

> *First*, the board never provided a written mandate to Cadet recognizing his ability to legally bind Teleco. *See supra* Parts II & IV.A.
>
> *Second*, Jean, as the president of the board of directors of Teleco, never provided a written mandate to Cadet delegating Jean's authority—received from the board on June 3, 1998—to Cadet. *See supra* Parts II.B. & IV.A.
>
> *Third*, even if it is assumed that Cadet could have provided a verbal mandate delegating his authority to Cadet, which contradicts article 1749 of the Code, because Cadet was not a member of Teleco's board, there is no evidence that Jean delegated such function to him. *See supra* Parts II.E & IV.A.
>
> *Fourth*, Teleco did not tacitly ratify the shareholders agreement because it never exercised rights under the agreement. *See supra* Parts II.E. & IV.B.
>
> *Fifth*, the doctrine of apparent mandate is inapplicable to Ciné because he is a professional. (*See, e.g.,* Gousse Testimony, Tr. 76:3–4 ("I'm 100 percent sure [the Haitian courts] would never apply such a doctrine regarding Mr. Cine.").) *See supra* Part IV.C.

No power of the board of directors of Teleco was delegated in writing, orally, or in any other way, to Cadet. Cadet did not have authority to sign the shareholders agreement on Teleco's behalf. The shareholders agreement is invalid as applied to Teleco. Neither Cadet's September 16, 1998 letter, nor the November 24, 1998 agreement, supersedes the licensing agreement of June 25, 1998.

Plaintiff has proven by clear and convincing evidence that the shareholders agreement of November 24, 1998 does not bind Teleco. Haitel has no right to arbitrate disputes it has with Teleco.

### VI. Statute of Limitations

The ten-year statute of limitations applicable to an action of nullity under art. 1089 of the Code (*i.e.*, the proactive right to demand that a court find a contract invalid or unenforceable) is not applicable to this action. *See supra* Part IV.D. The court finds that the defense of nullity for Teleco exists in perpetuity as to the November 24, 1998 agreement. *Id.* Teleco never agreed to become party to that contract by signing it, by agreeing to it, or by taking any action, or failing to take any action, as a form of ratification of it. Non-application of the statute of limitations to this figmental agreement is especially appropriate.

### VII. Waiver

The court need not resolve the issue raised by defendant of whether plaintiff offered sufficient expert testimony and documentation supporting its position that defendant waived his right to arbitration under Haitian law by continuing to participate in protracted litigation in the courts of Haiti. *See supra* Part II.G.

### VIII. Conclusion

Plaintiff's motion for an order permanently staying defendant's demand for arbitration is granted. The case is closed. Costs and disbursements to plaintiff.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date: December 19, 2014
Brooklyn, New York